Barbara A. Rohr, SBN 273353
**FARUQI & FARUQI**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Tel: (424) 256-2884
Fax: (424) 256-2885
Email: brohr@faruqilaw.com

*Counsel for Plaintiff*

[Additional Counsel on Signature Page]

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHN ZAVOLAS Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RELYPSA, INC., DANIEL K. SPIEGELMAN, JOHN A. ORWIN, JOHN P. BUTLER, PAUL J. HASTINGS, KENNETH J. HILLAN, M.B.Ch.B., DAVID W.J. MCGIRR, THOMAS J. SCHUETZ, M.D., Ph.D., and HELEN TORLEY, M.B.Ch.B., M.R.C.P.,<br><br>Defendants. | Case No.<br><br>**<u>CLASS ACTION</u>**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF SECTIONS 14(d)(4), 14(e) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff John Zavolas ("Plaintiff"), by and through his undersigned counsel, brings this stockholder class action on behalf of himself and all other similarly situated public stockholders of Relypsa, Inc. ("Relypsa" or the "Company") against Relypsa, Daniel K. Spiegelman, John A. Orwin, John P. Butler, Paul J. Hastings, Kenneth J. Hillan, David W.J. McGirr, Thomas J. Schuetz, and Helen Torley, the members of Relypsa's board of directors (the "Board" or the

"Individual Defendants"), for violations of Sections 14(d)(4), 14(e), and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") (15 U.S,C. §§78n(d)(4) 78n(e), 78t(a), and United States Securities and Exchange Commission ("SEC") Rule 14d-9, 17 C.F.R. § 240.14d-9(d) ("Rule 14d-9"), in connection with the purchase of Relypsa by Galenica AG, and Vifor Pharma USA Inc. ("Vifor" or "Merger Sub," collectively with Galenica AG, "Galenica"). Plaintiff alleges the following based upon personal knowledge as to himself, and upon information and belief, including the investigation of Counsel, as to all other matters.

## NATURE OF THE ACTION

1. Upon information and belief, Relypsa's board approved a sale of the Company in order to obtain personal benefits they negotiated with the Buyer to the detriment of Relypsa's public stockholders. The Buyer will acquire 100% of the outstanding shares of Relypsa common stock through an all-cash tender offer (the "Tender Offer") followed by a second-step merger (the "Proposed Transaction"). The Buyer has offered Relypsa investors $32.00 per share in cash, or a total of approximately $1.53 billion (the "Offer Price" or "Merger Consideration"). The Agreement and Plan of Merger, is dated July 20, 2016.

2. In the Solicitation/Recommendation Statement filed by Defendants on form 14D-9 with the SEC on August 4, 2016 (the "Recommendation Statement"), defendants failed to disclose all material information necessary for Relypsa stockholders to make an informed decision regarding the Proposed Acquisition. Specifically, the Recommendation Statement omits and/or misrepresents material information concerning, among other things: (1) the background of the Proposed Acquisition; (2) the data and inputs underlying the financial valuation exercises that purportedly support the so-called "fairness opinions" provided by Relypsa's financial advisors, Centerview Partners LLC ("Centerview") and Merrill Lynch, Pierce, Fermer & Smith Incorporated ("BofA Merrill Lynch"); and (3) Relypsa's financial projections, relied upon by Centerview and BofA Merrill Lynch.

3. Even though the $32.00 Offer Price does not fully value Relypsa's future standalone prospects, the Company's Board members agreed to support the Proposed Transaction because it will allow them to liquidate their Relypsa stock for a significant profit.

4. The Proposed Transaction undervalues Relypsa's prospects and is the result of an unfair, shortened and conflicted sale process. Importantly, after the transaction was announced both Wedbush and Guggenheim put price targets on the Company of $51.00 and $49.00 per share respectively, well above the $32.00 Offer Price.

5. In addition, the projections provided to Relypsa's bankers to permit them to prepare a so-called "fairness opinion," were not reasonably prepared and undervalued the Company because, (1) they ignore the revenue potential associated with Relypsa's anticipated evergreening of the nine patents associated with Relypsa's key drug Veltassa, (2) assume Relypsa will incur $836 million in research and development costs between 2016 and 2032, but receive no benefits whatsoever from those expenditures and (3) assume the Company will incur over $13 million in annual stock-based compensation expense at a time when the Company's free cash flows are declining by over 60% per year.

6. The Offer Price is also inadequate given the value Galenica expects to reap from the deal, including the ability to spin off its Vifor Pharma unit which already owns the rights to sell Relypsa's key drug Veltassa outside the United States.

7. In a joint press release touting the Proposed Transaction to Relypsa's stockholders, Galenica noted that the Proposed Transaction "is expected to significantly strengthen Vifor Pharma ahead of the planned division of the Galenica Group into two independent companies in 2017, with an extensive specialist product portfolio to include both the intravenous iron deficiency treatment Ferinject (ferric carboxymaltose) and Veltassa."

8. Furthermore, the Company engaged a conflicted financial advisor Centerview at the outset of the sales process. The Company did this even though it knew two months in advance of entering into the Merger Agreement, that Centerview had been simultaneously engaged by Galenica to work as a financial advisor on other matters. Notably, Centerview as financial advisor was responsible for the market check discussed with the Company Board which only solicited two new potential third parties. These two parties were in addition to the three parties that had already independently contacted the Company, one of which was never ultimately solicited for a bid. Rather than end the relationship with the clearly conflicted Centerview, the Company instead

chose to continue to retain them but to also engage BofA Merrill Lynch late in the process. Upon information and belief, BofA Merrill Lynch's financial analyses was therefore curtailed by the short amount of time in which they had to perform their assignment. Thus, the Company wasted stockholder assets in unnecessarily retaining two financial advisors.

9. Defendants now seek the approval of Relypsa's stockholders in support of the Proposed Transaction and ask them to tender their shares in the Tender Offer based upon the materially incomplete and misleading information Defendants disseminated to them via the Schedule 14D-9 Recommendation Statement.

10. For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from closing the Tender Offer and taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Relypsa stockholders before the expiration of the Tender Offer, currently set for August 31, 2016, or, in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

11. This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(d), 14(e) of the Exchange Act and Rule 14d-9 promulgated thereunder and Section 20(a) of the Exchange Act.

12. Personal jurisdiction exists over each Defendant either because the Defendant is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

13. Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue had an effect in this District; and (ii) Relypsa has its principal place of business in Redwood City, California, within this District.

**PARTIES**

14. Plaintiff John Zavolas is, and has been at all relevant times, a stockholder of Relypsa common stock.

15. Defendant Relypsa (NASDAQ: RLYP) is a biopharmaceutical company spearheading the discovery, development and commercialization of polymer-based medicines to treat conditions that are often overlooked and under treated. Defendant Relypsa is a Delaware corporation headquartered in Redwood, California. Relypsa has over 400 employees. Relypsa has a unique platform that includes a proprietary high-throughput chemistry process, enabling it to efficiently explore thousands of potential polymer medicines for each disease it seeks to address. Relypsa's polymers are non-absorbed, meaning they act within the gastrointestinal tract and do not get absorbed into the bloodstream or other parts of the body. Relypsa's polymer technology may be able to address many health conditions in need of viable treatment options.

16. Defendant Daniel K. Spiegelman is and at all material times was the Chairman of the Company's board.

17. Defendant John A. Orwin is the CEO of Relypsa and at all material times was a member of the Company's board.

18. Defendant John P. Butler is and at all material times was a member of the Company's board.

19. Defendant Paul J. Hastings is and at all material times was a member of the Company's board.

20. Defendant Kenneth J. Hillan, M.B.Ch.B. is and at all material times was a member of the Company's board.

21. Defendant David W.J. McGirr is and at all material times was a member of the Company's board.

22. Defendant Thomas J. Schuetz, M.D., Ph.D. is and at all material times was a member of the Company's board.

23. Defendant Helen Torley, M.B.Ch.B., M.R.C.P. is and at all material times was a member of the Company's board.

24. The Defendants referred to in ¶¶ 11-18 above are collectively referred to herein as the "Board" or the "Individual Defendants."

25. Non-party Galenica AG is a public limited company existing under the laws of Switzerland.

26. Non-party Merger Sub is a Delaware corporation and a wholly owned subsidiary of Galenica.

**CLASS ALLEGATIONS**

27. Plaintiff brings this Action as a class action pursuant to Fed. R. Civ. P. 23 individually and on behalf of all other holders of Relypsa common stock (except defendants named herein and any person, firm, trust, corporation, or other entity related to or affiliated with them and their successors in interest) who are or will be threatened with injury arising from Defendants' wrongful actions as more fully described herein (the "Class").

28. This action is properly maintainable as a class action.

29. The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, Plaintiff believes there are thousands of members in the Class. As of August 1, 2016, there were (i) 44,882,597 shares of Common Stock issued and outstanding; (ii) 4,753,020 shares issuable upon the exercise of outstanding options; (iii) 997,523 shares issuable. upon the vesting of outstanding restricted stock units; (iv) 255,149 shares issuable upon the exercise of outstanding and unexpired warrants; and (v) 188,338 shares estimated to be subject to issuance pursuant to Relypsa's 2013 Employee Stock Purchase Plan, as amended. The holders of these shares of stock are believed to be geographically dispersed throughout the United States. All members of the Class may be identified from records maintained by Relypsa or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

30. Questions of law and fact are common to the Class and predominate over questions affecting any individual class member. The common questions include, *inter alia*, the following: (i) whether Defendants have misrepresented or omitted material information concerning the

Proposed Transaction in the Recommendation Statement in violation of Section 14(e) and 14(d)(4) of the Exchange Act and Rule 14d-9 promulgated thereunder; (ii) whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and (iii) whether Plaintiff and other members of the Class will suffer irreparable harm if the Proposed Transaction is consummated as presently anticipated.

31. Plaintiff's claims are typical of the claims of the other members of the Class. Plaintiff and the other members of the Class have sustained damages as a result of Defendants' wrongful conduct as alleged herein.

32. Plaintiff will fairly and adequately protect the interests of the Class, and has no interests contrary to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.

33. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude maintenance as a class action.

**SUBSTANTIVE ALLEGATIONS**

34. The announcement of the Proposed Transaction comes just as the Company is set to reap billions in profits from its first new drug Veltassa.

35. Veltassa was accepted as a new drug application ("NDA") by the FDA on December 15, 2014. Veltassa is also referred to as Patiromer for Oral Suspension ("Patiromer FOS") and is used to treat hyperkalemia, a serious condition defined as abnormally elevated levels of potassium in the blood.

36. In announcing the FDA's acceptance of an NDA for Veltassa, the Company's president and CEO stated: "Acceptance of our NDA is a significant milestone that triggers greater intensification of our steps toward commercial readiness. . . . If approved, we believe Patiromer FOS may be the first new therapeutic innovation available to treat patients with hyperkalemia in both acute and chronic settings in over 50 years. We also believe there is a significant unmet medical need for patients, particularly as it relates to chronic therapy, and we are planning for

broad access to the drug. Based on the robust data which demonstrated the early onset of action and favorable safety profile for up to one year, we believe that Patiromer FOS, if approved, will become an important new treatment option for patients with hyperkalemia."

37. On March 14, 2015, the Company announced Phase 2 data showing efficacy of Veltassa in heart failure patients with chronic kidney disease.

38. The Company announced more encouraging news on March 26, 2015, when it disclosed that data from a Phase 3 clinical program showed that Veltassa was effective in reducing potassium levels and preventing a recurrence of hyperkalemia in patients with advanced (stage 4 5) chronic kidney disease receiving ongoing treatment with renin-angiotensinaldosterone system inhibitors.

39. On July 14, 2015, Relypsa announced that one-year data from the Phase 2 AMETHYST-DN trial of Veltassa showed that patients with chronic kidney disease (CKD) and mild or moderate hyperkalemia who were treated with Veltassa had statistically significant decreases in blood potassium levels from baseline at four weeks ($p < 0.001$; primary endpoint). Veltassa quickly reduced potassium levels, with significant reductions at the first post baseline assessment, approximately 48 hours after treatment stated ($p < 0.001$). Patients maintained normal blood potassium levels through 52 weeks of treatment. Veltassa was well tolerated when taken for up to one year.

40. On August 10, 2015, Galenica took the first step towards its proposed acquisition of Relypsa when it acquired an exclusive partnership to commercialize Veltassa in Europe. Under the terms of the agreement, Relypsa received an upfront cash payment of $40 million and became eligible to receive payments of up to $125 million upon achieving certain regulatory based milestones. In addition, Relypsa received a tiered double-digit royalty on net sales of Veltassa in licensed territories.

41. On October 21, 2015, Relypsa announced that Veltassa had been approved by the FDA for the treatment of hyperkalemia. In the press release, Relypsa's president and CEO stated: "The FDA approval of Veltassa represents approximately a decade of research by dedicated

scientists and doctors, and underscores Relypsa's commitment to developing polymerbased treatments for people with conditions that are often overlooked and undertreated."

42. On November 6, 2015, Relypsa announced the results of a sub-group analyses from Phase 3 OPAL-HK Trial of Veltassa. Relypsa stated that data showed Veltassa significantly reduced and maintained control of blood potassium levels in hyperkalemic CKD patients age 65 and older who were also receiving renin angiotensin aldosterone system (RAAS) inhibitor therapy. A separate post-hoc analysis also from the OPAL-HK trial showed Veltassa's efficacy in treating hyperkalemia was not diminished by concomitant use of diuretics. Veltassa was well tolerated in both sub-groups, with mild-to-moderate constipation as the most common adverse event.

43. On December 21, 2015, Relypsa announced that Veltassa was finally available to be purchased in the United States.

44. On January 25, 2016, Relypsa announced the results of a drug-drug interaction study which demonstrated Relypsa's efficacy was not affected by its administration alongside other drugs.

45. Veltassa was an instant success. In announcing first quarter 2016 results Relypsa's president and CEO stated: "[w]e made great progress in our first full quarter with Veltassa on the market. We saw solid month-over-month growth of prescriptions, reported early success with payers, including agreements with the two largest pharmacy benefit managers, and have had a positive reception from treating physicians."

46. Relypsa also disclosed that due to the recent submission of an MAA requesting European approval of Veltassa, the Company was another step closer to bringing Veltassa to patients outside the United States.

47. The Company received more good news on May 27, 2016, when Astra Zeneca announced that the FDA issued a Complete Response Letter regarding the NDA for ZS-9, a potentially competing product to Veltassa, explaining that the FDA decided the NDA to market ZS-9 would not be approved in its present form.

48. As of the merger announcement Relypsa has successfully obtained 9 patents associated with Veltassa. The patents and patent applications relating to Veltassa are all owned by

Relypsa. The issued composition of matter patents (U.S. Patent Nos. 8,147,873, 8,282,913, and 8,337,824), if the appropriate maintenance fees are paid, are expected to expire between 2026 and 2030. The issued methods of treatment patents (U.S. Patent Nos. 7,556,799, 8,216,560, 8,287,847, 8,475,780, 8,778,324 and 8,889,115), if the appropriate maintenance fees are paid, are expected to expire between 2024 and 2027.

49. Relypsa is also in the process of evergreening its patent portfolio. Relypsa currently has at least two pending patent applications, and disclosed in its recommendation statement that it intends to spend $836 million on research and development over the next 10 years. Relypsa also has at least two currently pending patent applications (publication numbers 20130189216 and 20130131202).

50. For several years Relypsa rejected overtures to pursue strategic alternatives and refused to engage Centerview as its financial advisor more than once.

51. In April of 2016, however, Galenica expressed interest in Relypsa which interest was now was returned. Unlike other potential purchasers who had been ignored, Relypsa's President and CEO met with Galenica on April 18, 2016.

52. On April 25, 2016, the Board met to discuss Galenica's interest in acquiring the Company at an unspecified price and agreed to permit Galenica to conduct due diligence.

53. Then, on May 19, 2016, after giving Galenica a significant time advantage in the sale process, the Company finally entered into a confidentiality agreement with Party B, but continued to avoid other potential purchasers.

54. The Board discussed five potential counterparties (including Galenica, Party A and Party B) on May 23, 2016, but then ignored Party A and the three other potential purchasers. Subsequently on May 27, 2016 the Board decided to contact Parties A and C, but continued to disregard two other potential purchasers it had identified and failed to contact them at any point in time during the sale process.

55. In addition, instead of retaining an independent financial advisor, on May 27, 2016, the Board approved the retention of Centerview even though the Board knew (1) Centerview had longstanding ties to Galenica, (2) was providing advice related to Galenica's planned spinoff of

Vifor and (3) the spinoff of Vifor would be easier to accomplish if Galenica was able to purchase Relypsa.

56. Becauuse of Centerview's conflict of interest, later the same day the Board solicited Merrill Lynch, Pierce, Fenner & Smith Incorporated ("BofA") to provide a second fairness opinion. If the Board truly believed Centerview had a conflict of interest it should have not wastefully engaged Centerview. If the Board did not believe Centerview was impermissibly conflicted it should not have wastefully retained a second duplicative financial advisor. Moreover, while the Board permitted Centerview to run the sale process, it still negotiated a fee with BofA that was partially contingent on a sale of the Company. If the Board wanted a non-conflicted second fairness opinion from BofA, it should have entered into a fee arrangement that was not impacted by the success or failure of an acquisition of the Company.

57. As the sale process moved forward, the Board permitted its conflicted financial advisor, Centerview, rather than BofA, to lead the sale process.

58. Then on July 20, 2016 the Board agreed to Galenica's unreasonably low offer of $32.00 per share, even though the Board had repeatedly indicated that "an offer closer to $34.00 per Share was more reflective of the value of Relypsa."

59. On July 21, 2016 Relypsa and Galenica issued a press release announcing the Proposed Transaction.

60. The $32.00 Offer Price that Relypsa's public stockholders stand to receive is insufficient, as it fails to adequately account for the Company's strong financial prospects and the tremendous benefits Galenica will reap from the Merger.

61. The Proposed Transaction was not supported by analysts. After the announcement of the Proposed Transaction on July 21, 2016, Wedbush put a $51 price target on the company and explained:

> While we see $32 per share as an acceptable offer, we believe there is room for at least one additional bidder. On April 7th, a Reuters news article indicated that Relypsa received multiple overtures from potential buyers. With millions of CKD and heart failure patients experiencing hyperkalemia, we estimate the potential for peak annual sales to reach over $1 billion just in the U.S. and view the offer of $1.53 billion as approximately one-time

> peak sales. We note a comparable transaction when competitor ZS Pharma was acquired by AstraZeneca (AZN) for $2.7 billion in cash announced on November 6, 2015 citing current estimates for worldwide peak annual sales of ZS-9 to exceed $1 billion. Our $51 price target implies $2.285 billion equity value. A likely additional suitor in our view, Sanofi (SNY) sells a polymer-based (sevelamer) phosphate binder and reported $935 million in sales during 2015. On August 10, 2015 Relypsa and Sanofi announced a two year detailing agreement in which Sanofi provides commercial support from their established nephrology sales force and receives a service fee and potential incentive payments. We view Veltassa as a natural fit for Sanofi adding another nephrology drug to their polymers are not absorbed marketing theme.

62. Likewise, on the same day Guggenheim put a $49.00 price target on the Company and explained:

> **Offer price implies more modest commercial prospects than our forecast.** Our PT is based on a DCF analysis of the commercial opportunity for Veltassa, to which we apply a 10% WACC to cash flows through 2028 and a 2.5x terminal EBITDA multiple implying perpetual FCF growth of -16% thereafter, an expected rate after Veltassa patent exclusivity lapses. According to our model, the $32/share offer represents anticipated peak U.S. sales of approximately $1B in 2028 (penetrating approximately 8% of our estimated U.S. population of hyperkalemic CKD and heart failure patients) as compared with our baseline assumptions of $1.3B in peak U.S. sales (approximately 9% of U.S. hyperkalemia patients), though our model also contemplates expenses in excess of the "low-triple-digit" investment referenced by Vifor Pharma. Incorporating this data point into our model as reflecting potential synergies, we would see the purchase price reflecting peak U.S. sales of approximately $870M (7% market share) and therefore about a 1.8x sales multiple.
>
> * * *
>
> **Offer price well shy of comparable valuation for ZS Pharma buy out.** The $1.5B offer is substantially lower than the $2.7B AstraZeneca (AZN, NC, $30.57) paid to acquire ZS Pharma that was announced in November 2015. At that time, AZN expressed the belief that global sales of ZS-9 could exceed $1B per annum, an estimate we believed contemplated modest market share capture, based on population demographics. We translated the ZS Pharma purchase price to a sales pace, applied RLYP's patiromer patent exclusivity and adjusted for PTS and likely tax differences. That analysis, albeit somewhat crude, yielded a fair value for RLYP shares in the $60-$65 range to an acquirer, implicitly assuming Veltassa and ZS-9 have approximately equal prospects for treating hyperkalemia

63. Galenica will thus capitalize on Relypsa's significant prospects for future growth and profits while depriving the Company's stockholders of the ability to maintain equity in the post-Merger company, and without fairly compensating them for their Relypsa shares.

64. Defendants now propose Relypsa stockholders should accept the inadequate Merger Consideration by tendering their shares in the Tender Offer based upon materially incomplete and misleading information in the 14D-9. Stockholders must receive complete and accurate information about the Proposed Transaction prior to deciding whether to tender their shares. To date, however, Defendants have failed to provide Relypsa stockholders with such information.

65. In summarizing the work Centerview performed for Galenica, the Recommendation Statement merely states that Centerview would receive a fee in a "fixed amount" in connection with its advice related to the spinoff of Vifor, which the Recommendation Statement misleadingly describes as an "unrelated financial advisory matter[]" and that "Centerview is entitled to receive fees totaling as much as CHF 8.5 million for its prior work and ongoing work for parent."

66. Stockholders are entitled to know if Centerview's fee is increased in any manner if the Vifor spinoff is successful. This is a material fact because Galenica's proposed purchase of Relypsa will improve its chances of a successful spinoff of Vifor. Accordingly, Relypsa stockholders are entitled to a specific description of Centerview's fee in connection with that engagement so they can assess Centerview's conflict of interest.

67. The Recommendation Statement also fails to note that Centerview has a 10 year relationship with Galenica. In addition, Centerview has provided advice to Galenica regarding potential acquisition targets. Although the Recommendation Statement does indicate that Centerview provided advice to Galenica related to "potential future acquisitions by Galenica" and that Centerview was "not representing Galenica in connection with a potential acquisition of Relypsa or any related matters" that does not mean Centerview did not provide advice related to an acquisition of Relypsa or an alternative thereto for which it was not formally engaged.

68. The Recommendation Statement was therefore required to disclose whether Centerview provided any advice to Galenica for which it was not formally engaged related to an

acquisition of Relypsa or any alternative thereto. Without this information the Recommendation Statement's disclosures related to Centerview's conflicts of interest are rendered materially false and misleading.

69. Stockholders are also entitled to know whether Centerview used any information or provided any advice related to the proposed Relypsa transaction in connection with its advice related to Galenica's planned spinoff of Vifor. This information is material because it relates to whether Centerview has an improper conflict of interest or misappropriated confidential information and is necessary to ensure the Recommendation Statement's disclosures related to Centerview's conflicts of interest are rendered materially false and misleading.

70. Also, the Recommendation Statement does not disclose whether any member of the Centerview team, was currently or previously providing advice to Galenica. This information is material because it relates to the extent of Centerview's conflict of interest and is necessary to ensure the Recommendation Statement's disclosures related to Centerview's conflicts of interest are rendered materially false and misleading.

71. Page 17 of the Recommendation Statement indicates that "[o]n May 22, 2016, John Butler, a member of the Relypsa Board, delivered an e-mail to Mr. Spiegelman, Mr. Orwin and Ronald Krasnow, Senior Vice President and General Counsel of Relypsa, stating that, at that time, Mr. Butler intended to recuse himself from the meeting of the Relypsa Board on the following day and any future discussions to the extent they related to Galenica's proposal to acquire Relypsa or any related transaction process." The Recommendation Statement, however, provides no reason why Mr. Butler recused himself and whether he believed he may have a conflict of interest in connection with the Proposed Transaction. Thus, a fuller explanation of Butler's recusal is necessary to ensure the statements related to Mr. Butler's recusal are not false and misleading.

72. Although page 45 contains a summary of BofA's discounted cash flow analysis and includes the definition of unlevered free cash flows used by BofA, which appears to show that BofA did not atypically treat stock-based compensation as a cash expense, the summary of Centerview's discounted cash flow analysis on pages 38 and 39, does not disclose whether Centerview reduced Relypsa's value by treating stock-based compensation as a cash expense. This

disclosure is necessary to ensure stockholders are not mislead by the value resulting from BofA's discounted cash flow analysis.

73. The summary of Relypsa's projections on pages 48 through 62 of the Recommendation Statement is inadequate because it does not provide stockholders a fair summary of the reasons for certain assumptions in each of the projection sets that appear to be unrealistic. For example, each of the projection sets assumes the Company will go into a death spiral after Veltassa's drug exclusivity expires in 2030. The Recommendation Statement, however, provides stockholders no information why the Company would not benefit from the evergreening of its patent portfolio.

74. Moreover, Relypsa appears to be in the process of evergreening its patent portfolio currently as it has at least two pending patent applications. In addition, all of the projections assume Relypsa will incur $835 million in research and development costs, but at the same time project that no benefits will be obtained from the expenditure of the $835 million. The Recommendation Statement is misleading unless it explains why the Company is incurring research and development costs but not receiving any benefits from the expenditures. If the Company does not intend to spend research and development money on evergreening its patent portfolio and attempting to create new drugs, then those expenses should be removed from the projections which, in turn, would increase the Company's projected future value. Thus, stockholders are entitled to proper projections which lead to a proper projected future value.

75. The projections also ignore the possibility that a generic drug manufacturer might not be able to determine the process by which Relypsa manufactures Veltassa and therefore not have the ability to obtain approval through an Abbreviated New Drug Application. If this came to pass, it would have the effect of essentially extending the exclusivity period as a generic manufacturer proceeds with a slower drug approval process. Therefore, stockholders are entitled to a fair summary of the basis for management's assumption that this would not occur. Furthermore, each of the projection sets assumes the Company will incur in excess of $13 million in annual stock based compensation expense between 2030 and 3032 (which was expected to

increase each year) even though the projections also assume that during those years the Company would be in a death spiral.

76. The Company should therefore explain why stock-based compensation expense is increasing at a time when the Company's stock would in theory be dropping in value with the result that all or some of the stock options would be underwater and therefore worthless. In sum, without a fair summary of the illogical assumptions in Relypsa's projections stockholders will be misled regarding the weight to afford Relypsa's projections.

**COUNT I**

**On Behalf of Plaintiff and the Class for Violations of Section 14(e) of the Exchange Act**

**Against Relypsa and the Individual Defendants**

77. Plaintiff repeats and realleges each allegation set forth herein.

78. Section 14(e) of the Exchange Act provides that it is unlawful "for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading..." 15 U.S.C. 78n(e).

79. Relypsa filed and delivered the 14D-9 to its shareholders, which Defendants knew or recklessly disregarded contained material omissions and misstatements as set forth above. The 14D-9 was prepared, reviewed and/or disseminated by Defendants. It misrepresented and/or omitted material facts, including material information about the consideration offered to shareholders via the Exchange/Tender Offer, the intrinsic value of the 25 Company, and potential conflicts of interest faced by certain Individual Defendants and the Company's financial advisor.

80. In so doing, Defendants made untrue statements of material facts and omitted material facts necessary to make the statements that were made not misleading in violation of Section 14(e) of the Exchange Act. By virtue of their positions within the Company and/or roles in the process and in the preparation of the 14D-9, Defendants were aware of this information and their obligation to disclose this information in the 14D-9.

81. The omissions and incomplete and misleading statements in the 14D-9 are material in that a reasonable stockholder would consider them important in deciding whether to tender their

shares or seek appraisal. In addition, a reasonable investor would view the information identified above which has been omitted from the 14D-9 as altering the "total mix" of information made available to shareholders.

82. Defendants knowingly or with deliberate recklessness omitted the material information identified above from the 14D-9, causing certain statements therein to be materially incomplete and therefore misleading. Indeed, while Defendants undoubtedly had access to and/or reviewed the omitted material information in connection with approving the Proposed Transaction, they allowed it to be omitted from the 14D-9, rendering certain portions of the 14D-9 materially incomplete and therefore misleading.

83. The misrepresentations and omissions in the 14D-9 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

**COUNT II**

**On Behalf of Plaintiff and the Class for Violations of Section 14(d)(4) 20 of the Exchange Act Against Relvpsa and the Individual Defendants**

84. Plaintiff repeats all previous allegations as if set forth in full herein.

85. The Individual Defendants have issued the Recommendation Statement with the intention of soliciting stockholder support of the Merger.

86. Section 14(d)(4) of the Exchange Act and SEC Rule 14d-9 promulgated thereunder require full and complete disclosure in connection with tender offers. Specifically, Section 14(d)(4) provides that:

> Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance appropriate in the public interest or for the protection of investors.

87. SEC Rule 14d-9(d), which was adopted to implement Section 14(d)(4) of the Exchange Act, provides that:

> Information required in solicitation or recommendation. Any solicitation or recommendation to holders of a class of securities referred to in section 14(d)(1) of the Act with respect to a tender offer for such securities shall include the name of the person making such solicitation or recommendation and the information required by Items 1 through 8 of Schedule 14D-9 240.14d-101) or a fair and adequate summary thereof.

88. The Recommendation Statement violates Section 14(d)(4) and Rule 14a-9 because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, the Individual Defendants should have known that the Registration Statement is materially misleading and omits material facts that are necessary to render them non-misleading.

89. The Individual Defendants were at least negligent in filing the Recommendation Statement with these materially false and misleading statements. The misrepresentations and omissions in the Recommendation Statement are material to Plaintiff, and Plaintiff will be deprived of his entitlement to cast a fully informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Merger.

90. The misrepresentations and omissions in the 14D-9 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to make a fully informed decision if such misrepresentations and omissions are not corrected prior to the expiration of the Tender Offer.

91. Because of the false and misleading statements in the Recommendation Statement, Plaintiff is threatened with irreparable harm, rendering money damages inadequate. Therefore, injunctive relief is appropriate to ensure Defendants' misconduct is corrected.

## COUNT III

**On Behalf of the Plaintiff and the Class for Violations of Section 20(a) of the Exchange Act Against the Individual Defendants.**

92. Plaintiff brings this Exchange Act claim on behalf of himself as individuals and on behalf of all other Relypsa stockholders.

93. Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

94. The Individual Defendants acted as controlling persons of Relypsa within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Relypsa, and participation in and/or awareness of the Company operations and/or intimate knowledge of the false statements contained in the Recommendation Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.

95. Each of the Individual Defendants were provided with or had unlimited access to copies of the Recommendation Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

96. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Recommendation Statement, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same. The Recommendation Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Merger. They were, thus, directly involved in the making of this document.

97. In addition, as the Recommendation Statement sets forth at length, and as described herein, the Individual Defendants were each involved in negotiating, reviewing, and approving the Merger. The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

98. By virtue of the foregoing, the Individual Defendants have violated Section 20(a) 26 of the Exchange Act.

99. As set forth above, the Individual Defendants had the ability to exercise control 28 over and did control a person or persons who have each violated Section 14(d)(4), 14(e) and SEC Rule 14a-9, by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act. As

a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A. Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B. Enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Tender Offer and Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Recommendation Statement and obtain increased merger consideration for the Company's stockholders;

C. In the event Defendants consummate the Proposed Transaction, awarding damages to Plaintiff and the Class;

D. Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E. Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

FARUQI & FARUQI

Dated: August 17, 2016 By: *s/ Barbara A. Rohr*

Barbara A. Rohr, SBN 273353
**FARUQI & FARUQI**
10866 Wilshire Boulevard, Suite 1470
Los Angeles, CA 90024
Tel: (424) 256-2884
Fax: (424) 256-2885
Email: brohr@faruqilaw.com

Thomas J. McKenna
Gregory M. Egleston
GAINEY McKENNA & EGLESTON

440 Park Avenue South, 5th Floor
New York, NY 10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0383
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

***Attorneys for Plaintiff***

**CERTIFICATION OF NAMED PLAINTIFF**

I, John Zavolas ("Plaintiff") hereby retain Gainey McKenna & Egleston and such co-counsel as appropriate, subject to their investigation, to pursue my claims on a contingent fee basis and for counsel to advance the costs of the case, with no attorneys fee owing except as may be awarded by the court at the conclusion of the matter and paid out of any recovery obtained and I also hereby declare the following as to the claims asserted under the law that:

Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in this private action.

Plaintiff reviewed a copy of the complaint and is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

Plaintiff's transactions in ***Relypsa, Inc.*** security that is subject of this action during the Class Period are as follows:

| No. of Shares | Stock Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| SEE ATTACHED | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

**Please list other transactions on a separate sheet of paper, if necessary.**

Plaintiff has sought to serve as a class representative in the following cases within the last three years:

None.

Plaintiff will not accept any payment serving as a representative party on behalf of the class beyond Plaintiff's *pro rata* share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 16 day of August, 2016

[signature]
Signature

John Zavolas
Print Name (& Title if applicable)

john.zavolas@ml.com
E-mail

34 E. Grand Avenue
Address

Montvale, NJ 07645
City, State, Zip

201-967-2714
Phone

| No. of Shares | Symbol | Buy/Sell | Date | Price Per Share |
|---|---|---|---|---|
| 171 | RLYP | Buy | 6/17/2016 | 17.5 |
| 300 | RLYP | Buy | 4/15/2016 | 20 |
| 325 | RLYP | Buy | 4/12/2016 | 22.3 |
| 315 | RLYP | Buy | 4/11/2016 | 22.1 |
| 2 | RLYP | Buy | 2/10/2016 | 15.88 |
| 1 | RLYP | Buy | 2/2/2016 | 18.2175 |
| 5 | RLYP | Buy | 1/15/2016 | 18.7191 |
| 1 | RLYP | Buy | 1/6/2016 | 25.3997 |
| 4 | RLYP | Buy | 12/11/2015 | 27.002 |
| 16 | RLYP | Buy | 12/10/2015 | 28.2045 |